**Bob Gene HARDING, Appellant,**

v.

**SINCLAIR PIPELINE COMPANY et al.,
Appellees.**

**No. 615.**

Court of Civil Appeals of Texas, Houston,
(14th Dist.)

May 10, 1972.

Rehearings Denied May 31, 1972.

Charles M. Haden, Harry L. Tindall,
Brown & Haden, Houston, for appellant.

Ronald L. Neill, Maurice Amidei, Don-
ald G. Canuteson, James R. Kinzer, Dallas,
James W. Mehaffy, O. J. Weber, Jr., Me-
haffy, Weber, Keith & Gonsoulin, Lip-

scomb Norvell, Jr., Benckenstein & Norvell, Beaumont, Gay Brinson, Jr., Vinson, Elkins, Searls & Smith, Houston, for appellees.

BARRON, Justice.

This is a personal injury suit. Bob Gene Harding, plaintiff, sued for personal injuries alleging negligence on the part of Sinclair Pipeline Company, Mobil Pipeline Company, and Gaylord Stickle Company, defendants. The District Court of Chambers County granted summary judgment in favor of all defendants. This appeal has been perfected from that judgment with Bob Gene Harding as appellant and the defendants as appellees.

Since the date of the accident, Gaylord Stickle has died, and Gaylord Stickle Company & Associates, Inc., successor in interest to Ruth Lucille Stickle, individually, as devisee under the will of Gaylord Stickle and as Independent Executrix of the Estate of Gaylord Stickle, d/b/a Gaylord Stickle Company, has been substituted as one party defendant. Suit was filed in this cause on October 10, 1967. Plaintiff seeks damages in the total sum of $640,000.00.

On appeal, appellant brings forward three points of error, to-wit: Mobil failed to mark and maintain proper warnings for its buried pipeline; Stickle failed to discover and mark the Mobil pipeline; Sinclair did not give an adequate warning of the Mobil pipeline to Lipsey, Inc. or to Lipsey's superintendent, Hendrickson.

In this summary judgment case the summary judgment evidence consists of depositions, interrogatories, admissions, and affidavits of various witnesses. The burden of proof was upon Sinclair Pipeline Company, Mobil Pipeline Company and Gaylord Stickle Company, movants, to prove controlling facts which do not conflict and which would show as a matter of law that the various defendants are not liable to Bob Gene Harding, the plaintiff-appellant. Gibbs v. General Motors Corporation, 450 S.W.2d 827 (Tex.Sup.1970); Torres v. Western Casualty and Surety Company, 457 S.W.2d 50 (Tex.Sup.1970); Tunks, Texas Summary Judgment Practice, 13 S. Tex.L.J. 1 (1971). Since summary judgment was granted by the trial court in favor of each defendant-appellee, we shall state the facts as best we can most favorably to appellant's causes of action against appellees.

In 1966, Sinclair Pipeline Company (hereinafter called Sinclair) decided to build a pipeline from Mont Belvieu to Port Arthur, Texas, a distance of some 83 miles. The pipeline right-of-way was surveyed and staked by Gaylord Stickle Company, an independent contractor employed by Sinclair on this job, along with the continuing participation of employees of Sinclair. Partly using the survey notes made by Stickle, Sinclair prepared an alignment or strip map or maps for each segment of the project and furnished copies thereof to the construction Contractor, Lipsey, President of Lipsey, Inc., an independent contractor of Sinclair employed to do the construction work, including ditch digging, boring under roads, and all work necessary to lay, construct, complete and make ready for operation a pipeline 8⅝ inches in diameter. Lipsey's pipeline superintendent was Carl J. Hendrickson, who in effect, was in charge of Lipsey's job. Lipsey was absent a great part of the time and he did not study the map before the accident. Appellant was employed by Lipsey to operate a backhoe, a ditch-digging machine with shovels. The machine sits still when it is digging, at a maximum range of about 15 feet, and when that is completed the machine moves so the ditching can be continued. It is a self-propelled piece of heavy machinery with caterpillar tracks.

From Stickle's notes mentioned above, from photographed sheets, ownership maps, county maps and from aerial mosaics, Sinclair prepared the alignment or strip maps and through Watkins, its chief inspector, delivered about ten copies of the strip maps to Hendrickson and Lipsey. It was

the apparent intention of Sinclair to give Lipsey, Inc. all the information available, and the strip maps were supposed to have shown all crossings of various types, including foreign pipeline crossings and including two pipelines belonging to Mobil and Magnolia which were near each other. The map itself, however, seems to us to be an approximation of the location of the intersection of the Sinclair line with the Mobil lines, though experienced witnesses adverse to appellant stated generally that the point of intersection could be located from the map. So far as we can determine, however, the intersection appears somewhere in the pasture of one W. V. Sutton, and there is no specific and definite location shown regarding the vital crossing of the pipelines determinable only from the map itself as more fully demonstrated below.

The Sinclair pipeline extended in a north-south direction. Sinclair notified Mobil that it was about to lay a new pipeline under the Mobil lines as shown by letter of M. W. Bellairs dated September 12, 1966. On September 19, 1966, by letter from J. R. Dean, apparently a Mobil officer, it was stated that "the crossing will be approximately 1½ miles east of Mont Belvieu" and that the location of Mobil's two lines was marked in red. A map was sent by Mobil, wholly insufficient for correct and definite determination of the crossing, but request was made by Mobil that it have a representative present before Sinclair was to dig under Mobil's line. This is supported by affidavit of R. H. Murphy, an employee of Mobile Pipeline Company. No further notification to Mobil was given by Sinclair.

While the evidence is in serious conflict, there was evidence that there were no survey stakes or flags showing the point of intersection between the Mobil pipelines and the new Sinclair pipeline. This is shown in particular by the testimony of Les Harding (brother of the appellant), O. D. Johnson, Horace Pierson, the appellant and others. Further, it is customary for

inpsectors to be present both from the company whose line is being crossed as well as from the line being laid. In this case there were no inspectors present. Several crossings had been made, and inspectors had been present. There were no markers of any kind to indicate a pipeline crossing, but after the explosion, Mobil sent someone out to put up some signs and paint the fence posts. W. V. Sutton, owner of the property where the explosion occurred, made an affidavit that his farm bordered FM Road 565 and a now paved road running south from Highway 565. The road leading south was not paved at the time, but was being widened for purposes of eventual paving. The fences had been moved back, and there were no signs or fence markings indicating the presence of a buried Mobil pipeline or pipelines. After the explosion, Mobil came out and painted the fence posts and erected some warning signs, but they were not there on October 21, 1966, the date of the explosion. Mobil concedes that it took no action to mark the actual point of intersection of the two pipelines, by answer to interrogatories. At the time of the explosion all parties knew the adjacent gravel road was being widened and that the fence lines had been moved back, which in all probability resulted in no signs, painted fence posts or vents on this gravel road disclosing the Mobil pipelines. The nearest the proof came to showing visible signs and indications of the Mobil lines was testimony of Sinclair and Stickle employees that one must stand facing in line with the Mobil pipelines, where signs could be seen down the line from that position. Mobil signs on the road had no warning facing away from the road and were not visible from the pasture, as in this case, where the crossing was attempted.

Regarding the nature of or the adequacy of the warning which Sinclair gave to the independent contractor, Lipsey, and his superintendent, Hendrickson (for which independent contractor appellant, the backhoe operator, worked), both of the above

persons received from thirty to ten days before the work began an alignment (strip) map of the proposed Sinclair pipeline to be constructed, with construction specifications. This is the usual procedure. Both the contractor and the superintendent testified that foreign pipeline crossings were shown on the strip map. But Lipsey did not know where the pipelines crossed until after the fire. Hendrickson stated that a "good set" of maps was furnished, and that he could tell from the map where the intersection point was located. How he could do so from the map alone is questionable, considering the 83 miles involved and the area generally encompassed. Hendrickson seemed to assume that Les Harding (brother of appellant) was then in charge of appellant, and he stated that he gave Les Harding a copy of the map. This was vehemently denied by Les Harding, who was a boring contractor (boring under roads, highways, etc. and having welded pipe pulled under the roads—a somewhat difficult job), and who was actually working with his appellant-brother at the time. All of the testimony shows that the construction crossing by one pipeline with a "loaded" pipeline is extremely dangerous. The Mobil and Magnolia lines were known to be loaded, containing liquified petroleum gas and ethylene. To demonstrate the uncertainty of the location of the crossing lines, the Mobil line had to be located with an M-Scope (a line-finding electronic instrument), and extensive probing from the surface of the ground with a probing bar was necessary. At times constructed lines had to be exposed and dug out by hand-digging. One witness who so testified was Hendrickson, Lipsey's superintendent. There was evidence that it was doubtful whether the strip map was sufficient to locate the Mobil line without a survey crew and without instruments under the circumstances of this case. Lipsey had no survey crew. We can find no summary judgment evidence that copies of the preliminary or construction surveys and notes made by Sinclair and Stickle were ever furnished to appellant's employers. The

only "warning" was the strip map, as viewed in the light most favorable to appellant's case. Appellant was injured about a week after the job began.

As a backhoe operator, Bob Gene Harding, appellant, was required to dig along an orange-flagged staked pathway as prepared by Stickle and Sinclair. The flags, usually at 200 foot intervals, indicated the centerline of the ditch. Stickle, with Sinclair's help, eventually made three surveys—preliminary, construction and final. The preliminary survey, made a few months before the construction survey, was made up of Stickle employees with Gibson of Stickle and Bennett of Sinclair in charge. The employees took orders from both men, though there is evidence that Bennett was actually in charge and had the ultimate right of control. This, however, is controverted. The survey crew's duties were to establish and re-establish a survey line, note fence crossings, road crossings, foreign pipeline crossings, and establish a line whereby a ditch line could be dug to construct the Sinclair pipeline. The preliminary survey was to establish a line and mark it with a 1 x 2 x 18 inch flat stake with a station number on it, and behind that stake was to be a ¾ x ¾ x 4 foot orange flag. Only orange flags were used in the preliminary survey, whether a foreign crossing was involved or not. Blue flags were used for danger spots in the later construction survey. The blue flags were specifically to warn the construction contractor and his employees where foreign pipelines were located. Donart, Sinclair's engineer, agreed that foreign pipelines are located with a line-finding instrument (an electronic instrument) and are probed with a probing bar, or dug out by hand. The construction survey was made so that everything would be new and visible at the time the contractor started his work. And Donart stated that for every foreign pipeline crossing shown on the strip map, this survey was to blue-flag it, or was to give a specific warning. He further stated that "The excavation had to follow the route laid out by these stakes which (Sinclair) and the Stickle

crew had placed." The route to be followed was not to be determined by anything else. Appellant was the man to follow the route and take notice of the blue-flags as locations of danger. There was ample evidence that the blue-flags did not exist, though such evidence was contradicted.

Donart testified that Sinclair knew that appellant was working in close proximity to the Mobil pipelines. However, no representative either of Sinclair or Mobil was present on the day of the explosion. Lipsey was in Bellville, Texas on the date of the explosion, and Hendrickson was on the road between Pasadena and the job site at the time. Another attempt at a warning was made by a procedure called "back stringing". When laying pipe near a foreign line an extra lap of 15 or 20 feet is required, and the workmen laying pipe beside the proposed ditch will lay a double row of pipe at certain points to make up for extra distances required. Hendrickson testified that this crossing location was "double strung". However, it was further shown that back stringing is done for many purposes, such as for crossings at the request of the landowner, for stock crossings, road crossings, creeks, gullies, and for many other purposes. Moreover, Sinclair disclaimed any accuracy of the alignment or strip map in its contract with Lipsey, and Lipsey stated that Sinclair did not warrant the accuracy of the maps. Again, the surveys and flaggings were made by Sinclair and Stickle, and as a matter of fact, Lipsey had nothing to do with that portion of the project.

Bennett, engineer for Sinclair, definitely stated that it was Lipsey's obligation to dig the line on the route laid out by Sinclair, and to facilitate that, certain stakes were put out. It was the obligation of Lipsey, or anyone working for him or under him or any subcontractor, to follow the route laid out by the stakes. Blue flags were supposed to be put out at danger spots, and it is the common custom for construction people to rely upon flagging put out by survey parties.

In the construction and the preparation for construction of Sinclair Pipeline Company's line from Mont Belview to Port Arthur, Sinclair executed written contracts with at least two separate independent contractors, viz: Stickle and Lipsey. Indemnity agreements were included in favor of Sinclair. Stickle was to make three surveys of the proposed line and stake and flag it in conjunction with Sinclair, who usually collaborated through its engineers. Lipsey was to do the construction work. Sinclair owned and operated the easement lines, was in possession thereof, and was the owner-occupier. Consequently, Bob Gene Harding, appellant, as a backhoe operator for Lipsey, an independent contractor, was a business invitee of Sinclair at the time he received his injuries when he struck the buried Mobil pipeline causing the explosion and extensive fire on October 21, 1966, shortly after noon of that day. This case, indeed, presents difficult questions involving an owner-occupier of land and premises in relation to business invitees working on such land and premises, and the duty or duties owed by the landowner to the business invitee in such cases. The above has been the subject of much uncertainty and controversy in this state. It is not for us in any manner to dispute the decisions of our Supreme Court, but from the facts as summarized above, most favorable from the evidence to appellant's case, to determine whether controlling fact issues were presented for a court or a jury which would warrant submissions of such fact issues, if any, for controlling determination.

In one of the modern cases on this subject, the Supreme Court stated in Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 431, 433 (1950) that:

> "The law places upon the owner or occupant of land the duty to use reasonable care to make and keep the premises safe for the use of persons invited to use the

premises for business purposes. . . . Included within the class of persons to whom this duty is owed are the employees of contractors performing construction or other work on the premises. . . . When the owner puts some other person in control of the premises or a part of them, such person likewise has the duty to keep the premises under his control in safe condition. . . . A general contractor on a construction job, who is in control of the premises, is burdened with the duty to use due care to provide a safe place for workmen on the premises, including the employees of other contractors. . . .

"Where the duty to keep premises in a safe condition is imposed on a person in control of them, this duty may include the duty to inspect the premises to discover dangerous conditions . . . or to warn such persons of the existence of dangers which could not reasonably be expected to be apparent or obvious,

. . . . . .

"Of course, a person cannot recover for injuries from dangers which he voluntarily encounters and which are open and obvious." (Citations omitted)

Other controlling cases are the oft-cited cases of Robert E. McKee, General Contractor, Inc. v. Patterson, 153 Tex. 517, 271 S.W.2d 391 (1954) and Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368, 378 (Tex.Sup.1963). Commenting on the "no duty" doctrine involving an owner-occupier of land, those cases generally hold that it is the duty of the owner to protect his invitees from dangers of which the owner knows, or of which he should know in the exercise of ordinary care. "If there are dangers which are not open and obvious, he is under a duty to take such precautions as a reasonably prudent person would take to protect his invitees therefrom *or to warn them thereof*. But if there are open and obvious dangers of which the invitees know, or of which they are charged with knowledge, then the occupier owes them

'no duty' to warn or to protect the invitees. This is so, the cases say, *because there is 'no duty' to warn a person of things he already knows, or of dangerous conditions or activities which are so open and obvious that as a matter of law he will be charged with knowledge and appreciation thereof."* (Emphasis added) The Court further held that volenti non fit injuria is an affirmative defense, and that the jury may be called upon to find the necessary facts both in "no duty" and in *volenti* situations.

The next important decision involved is the case most strongly relied upon by appellees, particularly Sinclair and Stickle, i. e. Delhi-Taylor Oil Corporation v. Henry, 416 S.W.2d 390 (Tex.Sup.1967). In the latter case it was held by the Court, speaking through Chief Justice Calvert, that an *adequate* warning to an independent contractor or his superintendent concerning hidden defects on the premises fully discharges the occupant's duty to warn the independent contractor's employees. The Court in such case held that adequate warning was there shown as a matter of law. In the Henry case, "The very work which Vickers (independent contractor) undertook for Delhi-Taylor was the uncovering of the dock loading lines and the placing of the lines in casings. Both Vickers and Smith (superintendent) were shown a plat of the lines before the work began (the nature and detail of the plat is not shown). *They knew the horizontal position but not the depth of the several lines. Smith knew of the general location of the lines from work done at the Delhi-Taylor plant on a prior occasion.* He testified that everybody who worked around there knew the area as 'pipeline alley'." (Parentheses and emphasis added) Delhi-Taylor's representative had warned both Vickers and the superintendent, Smith, that they should treat all the pipelines "as if they were under pressure" and "as though they were loaded" (that the lines were carrying flammable material). Henry was injured when a dragline operator punctured a pipeline containing toluene, a flam-

mable gas, which was ignited by Henry's welding torch.

While we recognize the above authority as being the unquestioned law in Texas, and we agree with the decisions, particularly the necessities involved in Delhi-Taylor v. Henry, supra, we do not believe the facts in this case present questions of law to this Court, relative to Sinclair and Stickle, and we believe the facts in this case are clearly distinguishable so far as disputed and controlling facts are concerned. Of course, any special issues submitted to a jury must be submitted under the rules and under the authority of such cases as Henry, McKee, Halepeska, and Henger, discussed above. In the present case, apparently it was the intention of Sinclair to give Lipsey and Hendrickson warning in three or four different particulars, viz: the strip or alignment map, which obviously did not locate the intersection of the Mobil and Sinclair pipelines specifically but gave a general approximation. This is shown by the work required actually to locate the lines with electronic equipment, extensive probing from the ground surface, and hand-digging. The second and most important and essential type of warning was the product of the survey crews, who were supposed to locate the center line of the ditch and place a *blue flag* with identification directly over any foreign pipeline, including Mobil's, for the direct purpose of warning Lipsey and his men, including appellant, that a danger spot was present, including foreign pipelines. This was a specific and superseding warning of danger. For the purposes of this summary judgment case, such warnings directly failed and were misleading and created new danger. There is evidence that the flags were non-existent at the critical place and that Sinclair and Stickle knew or should have known it. Camp v. J. H. Kirkpatrick Co., 250 S.W.2d 413, 416 (Tex.Civ.App.-San Antonio 1952, writ ref'd n. r. e.). Both Sinclair and Stickle worked the survey and did the flagging, and in addition, the borrowed servant

question as pleaded was involved. Whether Stickle's men were borrowed servants or not, if material, is still a question of fact, to be determined by a jury or other factfinder. Moreover, the flagging of the ditching line, under the circumstances, was by far the most important and superseding method of warning involved, because any misrepresentation of this kind would be clearly paramount to Lipsey and his men concerning any warning possibly given by the strip map. Stickle and Sinclair assumed the duty of precise warning, which was relied on by Lipsey and its employees. See Pit Construction Company v. Holman, 438 S.W.2d 662, 664 (Tex.Civ.App.-Beaumont 1969, no writ); F. & C. Engineering Company v. Wall, 361 S.W.2d 582, 584 (Tex.Civ.App.-Beaumont 1962, writ ref'd n. r. e.). And see Thoreson v. Thompson, 431 S.W.2d 341, 344 (Tex.Sup.1968); Gulf, C. & S. F. Ry. Co. v. Smith, 87 Tex. 348, 28 S.W. 520, 522–523 (1894); Prosser Law of Torts, 3rd Ed., pp. 181–182 (1964).

The third types of warning, apparently relied upon by Sinclair and Mobil, were the allegedly painted fence posts and signs marking or indicating the location of the Mobil and Magnolia loaded pipelines. While there is competent evidence in the record to show the existence of such Mobil warnings, the evidence is conflicting in that several witnesses including the landowner testified that such painting and signs were not present, and that the fences and signs had been moved back to widen the right-of-way for a road which was about to be improved or paved. Moreover, adverse witnesses to appellant testified that one would have to be in an exact position to see such markers, if they existed, and that they were not visible from the pasture where the backhoe was located.

The forth attempted warning was the "back stringing" of pipe which was supposed to indicate danger. However, that method failed in that proof was adduced to show that double stringing of pipe occurred at many places and under many circumstances not related to points of danger·

or foreign pipelines, and the double string-ing her was near a road which was to be bored.

We believe that from all the evidence shown, Sinclair was not entitled to a summary judgment, and while we do not pass upon the merits of the case or the weight of the evidence, fact issues were raised which precluded such summary judgment. The case materially differs on the facts from Delhi-Taylor v. Henry, supra. See and compare Guidry v. Neches Butane Products Company, 476 S.W.2d 666, 668–669 (Tex.Sup.1972).

Under the facts here, it cannot be said that dangerous conditions were as well known to Lipsey and Hendrickson (and consequently to their employees) as they were to Sinclair. The misleading and deceptive flagging, which either Sinclair or Stickle or both assumed to the detriment of Lipsey and its employees, is alone sufficient to distinguish Delhi-Taylor v. Henry, supra, on the facts for summary judgment purposes.

Regarding Gaylord Stickle Company, such appellee's duty was to locate and flag all conditions requiring special treatment such as, but not limited to, pipeline crossings. Stickle's men at times worked with their own supervisor, and at times they worked with Sinclair's engineers, the latter of whom may have been in complete charge with the right of control of the project involving marking and surveying. But the duty of Stickle to mark exactly the buried pipeline was clear. It knew the blue-flagged stakes would be relied upon by the pipeline construction employees to disclose buried pipelines. In its motion for summary judgment, Stickle has asserted that Sinclair exercised such control over its survey crew that they became borrowed servants of Sinclair. Donart and Bennett, engineers for Sinclair, testified to the degree of control exercised over Stickle employees. However, the written agreement between Sinclair Pipeline Company and Gaylord Stickle Company, Section 6, ex-pressly provided that Stickle was an independent contractor and that Sinclair had no direction or control over the work or over the employees of the contractor except in the results obtained. While this may not be conclusive, only jury issues were shown in the case against Stickle, and summary judgment was improper. Certainly employees of one independent contractor owe the duty of reasonable care to the employees of another independent contractor working for the same employer, Sinclair, when both are working on the premises of said owner-occupier. Clearly special issues were warranted concerning whether Stickle or its employees were negligent in falsely flagging or failing to flag the right-of-way at a specific point of danger and whether such negligence was a proximate cause of the appellant's alleged injuries. The duty of ordinary care existed as between the parties, and the strip map did not alter the duty here. See Hernandez v. Heldenfels, 374 S.W.2d 196, 198–199 (Tex.Sup.1964); Fitzgerald v. Andrade, 402 S.W.2d 563, 566, 568 (Tex. Civ.App.-Austin 1966, writ ref'd n. r. e.). And compare Rabb v. Coleman, 469 S.W. 2d 384, 386 (Tex.Sup.1971).

We sustain the summary judgment of the trial court with regard to Mobil Pipeline Company. By letter dated September 12, 1966, W. M. Bellairs of Sinclair wrote M. E. Powell, Division Manager of Mobil Pipeline Company, that Sinclair Pipeline Company would be constructing a pipeline along a route where Mobil may have existing facilities and enclosed a map with the route indicated thereon. By letter dated September 14, 1966, M. E. Powell requested J. R. Dean, area supervisor for Mobil, to reply to such letter of September 12, 1966 of W. M. Bellairs, and by letter dated September 19, 1966, together with accompanying map, Dean replied to Bellairs' letter and therein marked on his map in red the approximate location of the two pipelines as they would intersect. This was the same pipeline intersection where appellant was injured. In Dean's letter the

company's Beaumont telephone number was given, and a specific request was made to Sinclair for notification, and that Mobil would have a company representative present "when you dig under our lines." Affidavit of R. H. Murphy, a Mobil employee, corroborated the above to some extent, and further Murphy, when he noticed that Sinclair had begun work on the line at the crossing of State Highway 146, personally talked with J. J. Smith, an inspector for Sinclair. Murphy gave Smith his telephone number and requested notification prior to Sinclair's crossing of the two Mobil lines near FM 565 in order that he might be present at said proposed pipeline crossing at such time. None of Mobil's employees were ever notified by Sinclair or anyone else prior to the explosion and fire on October 21, 1966, though proper requests for notification were made.

■ For the purposes of this case we must assume, as some of the testimony shows, that Mobil's lines were not properly marked. There was no contractual agreement in Mobil's pipeline easement which required marking of the pipeline. However, Sinclair knew the location of the Mobil lines from the surveys made and from information received from Mobil. In this case, by reason of the ditching operations, an unusual or extraordinary use of the surface was required, and the initial burden is upon the one who excavates or digs up the surface to avoid striking the line, or to make reasonable inquiry as to the location of any lines which might be encountered. "The duty of the pipeline operator under these circumstances arises, then, when it is requested to *alter* its lines or their use, when it is asked for information, or when it is otherwise put on such notice that it is required to take particular action to protect the lives or property of others." Pioneer Natural Gas Co. v. K & M Paving Co., 374 S.W.2d 214, 219 (Tex.Sup.1963). Neither did any duty exist on Mobil's part to make further inquiries of Sinclair regarding the progress of the construction work on their pipeline premises. Unequivocal requests

were made of Sinclair by Mobil for such notification for the purpose of Mobil's protecting itself and others by having personnel present at the line crossing, but no notice ever came or was received by Mobil. As stated in Willmar Gas Co. v. Duininck, 239 Minn. 173, 58 N.W.2d 197, 200 (1953), cited with approval in Pioneer Natural Gas Co. v. K & M Paving Co., supra, 374 S.W.2d at p. 220:

"Under these circumstances it would be unreasonable to charge plaintiff with the duty of constantly watching the operations over which it had no control to ascertain, at its peril, when defendants intended to proceed with such work as might damage its service lines."

While reasonable inquiry was made by Sinclair as to the location of any lines which might be encountered, a satisfactory answer was received from Mobil, and for measures of specific safety which Mobil offered, no notice or request for same was made before the explosion as requested. "Under these circumstances, at least in the absence of a request of its owner or operator to *move or deactivate* the line, it is not unreasonable to place the burden of avoiding contact with the pipeline on the one making use of heavy-tracked equipment with knowledge of a pipeline in the vicinity." (Emphasis added). See Phillips Pipe Line Company v. Razo, 420 S.W.2d 691, 694–695 (Tex.Sup.1967).

The case of Young v. Herrington, 312 S.W.2d 685 (Tex.Civ.App.-Austin 1958, no writ) is distinguishable. There it became the duty of the pipeline owner to bury the lines or mark their location after unconditional notice was given by the landowner that the pipeline was hazardous to land clearing machinery and the operator. If Sinclair's inspectors had given the reasonable notification as above requested by Mobil at the proper time, a different rule of law might be applied here and the accident might not have occurred.

Mobil was never notified by Sinclair or anyone else of the actual proposed crossing

in question wherein appellant was injured. Mobil thus discharged its only possible duty to the only party to which it knew or had reason to know was connected with or associated with the pipeline crossing in question.

For the reasons stated above, the trial court's judgments relating to Sinclair Pipeline Company and Gaylord Stickle Company (now Gaylord Stickle Company & Associates, Inc.) are reversed and remanded to the trial court for trial on the merits, and the judgment below as it relates to Mobil Pipeline Company is affirmed. Appellant shall recover its costs from Sinclair and Stickle, and costs as related to Mobil are assessed against appellant.